**No. 21-55768**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

NORA PHILLIPS; et al.,

*Plaintiffs-Appellants*,

v.

U.S. CUSTOMS AND BORDER PROTECTION; et al.

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Central District of California
No. 2:19-cv-06338-SVW-JEM
Hon. Steven V. Wilson

_____

**PLAINTIFFS-APPELLANTS' OPENING BRIEF**

_____

Mohammad Tajsar
ACLU Foundation of Southern California
1313 West 8th Street
Los Angeles, CA 90017
Tel: 213.977.5268
mtajsar@aclusocal.org

*Attorney for Appellants*
Nora Phillips, et al.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... iv

INTRODUCTION ...............................................................................1

JURISDICTIONAL STATEMENT ........................................................5

ISSUES PRESENTED.........................................................................6

STATEMENT OF THE CASE...............................................................7

    I.    Factual summary .................................................................7

        A.    The Government's cross-border intelligence gathering program targeted United States citizens without any suspicion of wrongdoing .................................................................8

        B.    Defendants subjecting of Plaintiffs to searches and arrests as a result of their surveillance program ...........................................15

        C.    The Department of Homeland Security's internal investigation of Defendants' surveillance program.......................................17

    II.    Procedural History..............................................................19

        A.    Plaintiffs' causes of action and prayer for relief......................19

        B.    Plaintiffs' discovery motion seeking leave to take additional depositions ...............................................................20

        C.    Discovery concerning the Office of Inspector General's investigation ...........................................................23

        D.    The district court's ruling on discovery disputes and summary judgment motions.................................................28

SUMMARY OF THE ARGUMENT ....................................................35

STANDARD OF REVIEW .................................................................38

ARGUMENT ...........................................................................................40

I.  The district court's failure to rule on Plaintiffs' pending discovery
    disputes and failure to award additional needed discovery warrants
    reversal of summary judgment...........................................................40

    A.  The district court lacked discretion to ignore a pending
        discovery dispute ripe for decision prior to awarding summary
        judgment to Defendants. ..........................................................40

    B.  The district court improperly denied Plaintiffs' request for
        additional depositions. .............................................................44

II. The ongoing retention of records containing private information about
    Plaintiffs' protected associations and expression constitutes
    irreparable harm that confers standing to seek expungement............48

    A.  The Government's possession of ill-gotten information about
        Plaintiffs constitutes an injury-in-fact.....................................51

    B.  Plaintiffs satisfy the causation requirement of Article III.. ......57

    C.  Expungement will remedy Plaintiffs' injuries.. ........................58

CONCLUSION .......................................................................................64

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdelfattah v. U.S. Dep't of Homeland Sec.*,
  787 F.3d 524 (D.C. Cir. 2015) ..................................................................53

*Americans for Prosperity Found. v. Bonta*,
  141 S. Ct. 2373 (2021) ............................................................................65

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
  671 F.3d 140 (2d Cir. 2011)....................................................................55

*Buckley v. Valeo*,
  424 U.S. 1 (1976) .......................................................................... 57, 59

*Burnsworth v. Gunderson*,
  179 F.3d 771 (9th Cir. 1999) ..................................................................53

*Clark v. Cap. Credit & Collection Servs., Inc.*,
  460 F.3d 1162 (9th Cir. 2006) ................................................................46

*Clarkson v. I.R.S.*,
  678 F.2d 1368 (11th Cir. 1982) ..............................................................53

*Couch v. Wan*,
  No. 1:08CV1621 LJO DLB, 2011 WL 4499976 (E.D. Cal. Sept. 27, 2011)......50

*Doe v. U.S. Air Force*,
  812 F.2d 738 (D.C. Cir. 1987)................................................................62

*Fam. Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*,
  525 F.3d 822 (9th Cir. 2008) ......................................................... 41, 47

*Fazaga v. Fed. Bureau of Investigation*,
  965 F.3d 1015 (9th Cir. 2020) ................................................... passim

*Fendler v. U.S. Parole Comm'n*,
  774 F.2d 975 (9th Cir. 1985) ..................................................................52

*Garrett v. City & Cnty. of San Francisco*,
818 F.2d 1515 (9th Cir. 1987) ........................................................ 43, 44, 45, 49

*Gibson v. Fla. Legislative Investigation Comm.*,
372 U.S. 539 (1963) .................................................................................65

*Interstate Natural Gas Co. v. S. Cal. Gas Co.*,
209 F.2d 380 (9th Cir. 1953) ................................................................20

*Lee v. City of Los Angeles*,
250 F.3d 668 (9th Cir. 2001) ........................................................ 20, 21

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ................................................................. 52, 55, 61

*MacPherson v. IRS*,
803 F.2d 479 (9th Cir. 1986) ................................................................55

*Maurer v. Pitchess*,
691 F.2d 434 (9th Cir. 1982) ................................................................53

*Menard v. Saxbe*,
498 F.2d 1017 (D.C. Cir. 1974) ............................................................56

*NAACP v. State of Ala. ex rel. Patterson*,
357 U.S. 449 (1958) ....................................................................... 57, 65

*Nagel v. U.S. Dep't of Health, Education, and Welfare*,
725 F.2d 1438 (D.C.Cir. 1984) ............................................................55

*Nat'l Rifle Ass'n of Am. v. City of Los Angeles*,
441 F. Supp. 3d 915 (C.D. Cal. 2019) ................................................57

*Norman-Bloodsaw v. Lawrence Berkeley
Lab.*, 135 F.3d 1260 (9th Cir. 1998) ........................................... passim

*Oswalt v. Resolute Indus., Inc.*,
642 F.3d 856 (9th Cir. 2011) ................................................................41

*Paton v. La Prade*,
524 F.2d 862 (3d Cir. 1975) ..................................................................56

*R & R Sails, Inc. v. Ins. Co. of Pa.*,
    673 F.3d 1240 (9th Cir. 2012) ...................................................... 41, 43

*Republic of Ecuador v. Mackay*,
    742 F.3d 860 (9th Cir. 2014) ...............................................................41

*Sealed Appellant v. Sealed Appellee*,
    130 F.3d 695 (5th Cir. 1997) ................................................................53

*Shipp v. Todd*,
    568 F.2d 133 (9th Cir. 1978) ............................................... 52, 53, 57

*Spock v. United States*,
    464 F. Supp. 510 (S.D.N.Y. 1978) ......................................................58

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ..............................................................................54

*State of Cal., on Behalf of California Dep't of Toxic Substances Control v. Campbell*,
    138 F.3d 772 (9th Cir. 1998) ................................................ 42, 47, 50

*Stevens v. Corelogic, Inc.*,
    899 F.3d 666 (9th Cir. 2018) ................................................ 42, 44, 50

*Sullivan v. Murphy*,
    478 F.2d 938 (D.C. Cir. 1973) .............................................................56

*Tabbaa v. Chertoff*,
    509 F.3d 89 (2d. Cir. 2007)..................................................................53

*United States v. Smith*,
    940 F.2d 395 (9th Cir. 1991) ...............................................................53

*Wallis v. Princess Cruises, Inc.*,
    306 F.3d 827 (9th Cir. 2002) ...............................................................41

*Wash. Envtl. Council v. Bellon*,
    732 F.3d 1131 (9th Cir. 2013) .............................................. 61, 62

*Wilson v. Webster*,
    467 F.2d 1282 (9th Cir. 1972) .............................................................57

**Statutes**

5 U.S.C. § 552a ................................................................22

5 U.S.C. § 552a(g)(1) .........................................................5

28 U.S.C. § 1291 ........................................................ passim

28 U.S.C. § 1331 ...............................................................5

28 U.S.C. § 1346 ...............................................................5

**Rules**

Fed. R. App. P. 4(a)(1)(A) ..................................................5

Federal Rule of Civil Procedure 30(a)(2) .............................24

Federal Rule of Civil Procedure 56(d) ......................... passim

## INTRODUCTION

This appeal arises out of a challenge to the federal government's surreptitious investigation and surveillance of migrants, asylum-seekers, and humanitarian activists and lawyers on the Southwest border between late 2018 and early 2019. Plaintiffs-Appellants are three United States citizens—one non-profit leader and two immigration attorneys—targeted for surveillance and detention by an interagency collaboration of three federal government agencies, Defendants U.S. Customs and Border Protection ("CBP"), U.S. Immigration and Customs Enforcement ("ICE"), and the Federal Bureau of Investigation ("FBI").

Disclosure of portions of this surveillance program to the press revealed that Defendants had created a targeting list of dozens of activists, lawyers, journalists, and organizers who they suspected of being associated with the migrant caravans traveling through Central American and Mexico at the time. This list followed from a massive interagency intelligence collection operation that resulted in the creation of troves of secret government records detailing sensitive and private information about Plaintiffs, including biographical information, work histories, personal and professional associations, and descriptions of their political beliefs— all without any suspicion that Plaintiffs committed any crimes. Plaintiffs allege that this surveillance program resulted not only in the unjustified and unconstitutional creation of records about them, but facilitated their detentions and seizures at the

1

United States-Mexico border, including one six-hour arrest and interrogation at the San Ysidro Port of Entry near San Diego, California.

Plaintiffs brought this action alleging that Defendants' surveillance and seizure program violated their First and Fourth Amendment rights, as well as the federal Privacy Act. Plaintiffs sought, among other forms of relief, an order expunging from Defendants' databases the records they allege were the fruits of Defendants' unlawful surveillance and seizure program.

Following a truncated discovery schedule in district court, Defendants successfully moved for summary judgment. In granting Defendants' motion, the district court first rejected Plaintiffs' request to conduct additional necessary depositions of government officers Defendants themselves identified as possessing relevant information they "may use to support [their] claims or defenses." The district court also ignored a pending discovery dispute concerning an internal federal government investigation into Defendants' conduct, despite Plaintiffs timely raising the dispute and despite it being fully briefed. The district court then awarded judgment to Defendants on Plaintiffs' constitutional claims, ruling that Plaintiffs lacked standing to pursue either prospective injunctive relief or to seek expungement of the records Defendants generated (and continue to possess) about Plaintiffs' private and First Amendment-protected activity.

These rulings were in error and should be reversed. First, the district court lacked discretion to ignore a fully briefed and timely discovery application seeking discovery into a highly relevant federal government investigation of the surveillance program challenged in this case. In not ruling at all on the application, the district court prejudiced Plaintiffs' right to have their discovery dispute heard, an abdication of the court's discovery obligations. And in refusing to provide leave for Plaintiffs to take a modest amount of additional, necessary depositions of important percipient witnesses, the district court abused its discretion.

Further, the district court's refusal to recognize Plaintiffs' Article III standing to seek expungement misapplied settled Circuit precedent concerning litigants' right to challenge the retention and maintenance of records created in violation of the law. Defendants' continued storage of a tranche of secret records revealing private and sensitive information about Plaintiffs' expressive activities and associations confers standing to seek their destruction. The mere existence of these records in a government vault is a constitutional injury that Plaintiffs are entitled to remedy through expungement. The district court erroneously ruled otherwise when it demanded that Plaintiffs introduce evidence about how such records may further injure them in the future in some other, unforeseen fashion. But the Constitution does not impose any such added requirement, lest it immunize governments from judicial review for storing illegally acquired information in

secret about a citizenry hard pressed to know about it. This Court should reverse

the summary judgment award and remand with instructions to reopen discovery.

## JURISDICTIONAL STATEMENT

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1346, and 5 U.S.C. § 552a(g)(1). On June 22, 2021, the district court awarded judgment for Defendants. Excerpt of Record ("ER") 1-ER-2-23. Plaintiffs filed a timely notice of appeal. 3-ER-407-8; *see* Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

The issues presented in this appeal are as follows:

Whether the district court erred in deferring, and ultimately rejecting, Plaintiffs' request for additional depositions of percipient witnesses Defendants identified as possessing information relevant to the claims and defenses in this case.

Whether the district court erred in deferring and, and ultimately not deciding, Plaintiffs' discovery motion seeking information concerning the Department of Homeland Security's internal investigation into the surveillance and targeting of Plaintiffs.

Whether the district court committed legal error when it held that Plaintiffs lacked Article III standing to seek expungement of records stored by the Government that contained private, First Amendment-protected information about Plaintiffs obtained through allegedly unconstitutional seizures and surveillance.

## STATEMENT OF THE CASE

## I. Factual summary

Plaintiffs Nathaniel Dennison, Nora Phillips, and Erika Pinheiro are United States citizens who brought this action challenging a wide-ranging federal government surveillance and intelligence gathering program that targeted migrant rights activists, humanitarian leaders, and lawyers. Ms. Phillips and Ms. Pinheiro are lawyers who represent immigrants, migrants, and would-be asylum seekers north and south of the border through their legal services non-profit organization called Al Otro Lado. Mr. Dennison founded a media non-profit organization called Through My Eyes Foundation designed to provide under resourced youth with the skills and tools to visually document their lives and personal struggles. In late 2018, Mr. Dennison traveled to Mexico through his non-profit organization to work with youth seeking to present themselves for asylum at the United States border.

As a result of their work with migrants and asylum seekers, Defendants targeted each of them—along with dozens of other humanitarian workers, journalists, and lawyers—for unlawful scrutiny, searches and seizures, and surveillance. Plaintiffs brought this suit after details of Defendants' program leaked to the press. Below is a summary of the facts relevant to this appeal, as well as a recounting of its relevant procedural history.

**A.    The Government's cross-border intelligence gathering program targeted United States citizens without any suspicion of wrongdoing.**

Under the pretext of "securing the border" and the perceived threat of so-called migrant caravans (large gatherings of migrants and would-be asylum seekers traveling together through Central America and Mexico on route to the United States), the federal government—comprising Defendants U.S. Customs and Border Protection ("CBP"), U.S. Immigration and Customs Enforcement ("ICE"), and the Federal Bureau of Investigation ("FBI") and their directors—established a large bureaucracy designed to monitor all cross-border migrant activity north and south of the Southwest border.

The Department of Homeland Security established in October 2018 the first of these interagency working groups, known as the Emergency Operations Center, or "EOC." 4-ER-481. One of the EOC's principal duties was the creation and dissemination of a daily intelligence briefing circulated among scores of law enforcement personnel across the component agencies, collating information EOC members considered relevant to the working group's mission. *Id*.

The EOC's intelligence gathering mandate was extraordinarily broad. It was charged with collecting and spreading widely any information about the migrant caravans or anybody broadly associated with the migrant caravans, including "information about planned activities," and the results of any "investigative

activity and analytic activity relative to the individuals involved" in the migrant caravan. 4-ER-482. Critically, an individual need not have been suspected of a crime for the EOC to collect information about them. *Id.* For instance, a November 30, 2018 intelligence briefing created by the EOC and disseminated across the federal agencies profiles in detail organizations and activists merely because of their support for migrants and their immigrant rights activities. 4-ER-483. These individuals included Plaintiff Nora Phillips and another of her colleagues from Al Otro Lado, as well as four other Los Angeles-based activists and non-profit leaders. *Id.* The EOC briefing lists these individuals, including Ms. Phillips, specifically because they "have publicly expressed concerns for the current caravan situation and assisted with the prior migrant caravan of April 2018," and because they "advocate for immigrant rights and provide legal services and assistance with asylum claims and immigration proceedings and are expected to support and assist the current migrant caravan." *Id.* The document also includes additional profiles of other activists as well as information about planned protests. *Id.*

The EOC's intelligence gathering function was supported by another interagency working group, called the Integrated Border Intelligence Group, or IBIG. 4-ER-484. Executives at CBP, the FBI, and ICE's Homeland Security Investigations originally created IBIG in the summer of 2018 to assist in tackling transnational organized crime. *Id.* But IBIG's role soon expanded to support the

9

Government's border surveillance program. *Id*. IBIG specifically supported the EOC's mission to vet individuals the EOC collected information on, including Plaintiffs and other migrant rights' activists. *Id*. And the products of IBIG's intelligence gathering operation was similarly broadly distributed, including to regional law enforcement agencies. *Id*.

EOC and IBIG intelligence products have remained in federal government servers to this day. 4-ER-485. IBIG intelligence products were placed in a central repository, with ready access available to designated individuals in each of the Defendant agencies. *Id*. During the time relevant to this litigation, between Fall 2018 and Winter 2019, the EOC did not follow any written policies or guidelines governing the retention and sharing of EOC intelligence products. *Id*. With few exceptions, no limit existed on the content of intelligence files to be gathered and shared between the partner EOC and IBIG agencies. *Id*. Nor did any written guidelines or procedures exist about the type of intelligence that could be gathered about an intelligence target, or who may be the proper subject of this intelligence operation. *Id*.

Despite this massive intelligence gathering infrastructure, no criminal investigation resulted from the information collected by either EOC and IBIG. 4-ER-486.

In addition to EOC, CBP itself maintained an active intelligence operation within the United States Border Patrol, one of its component law enforcement agencies, and its own Office of Intelligence. 4-ER-486. The San Diego Sector of the Border Patrol (the principal field office responsible for the intelligence gathering operation challenged here) housed an intelligence unit called the Sector Intelligence Unit, responsible for amassing and sharing intelligence within the Border Patrol (and beyond). *Id*. This unit also collected troves of records about the migrant caravans, its organizers, and anybody CBP's analysts believed were associated with them. *Id*. For instance, the unit collected detailed records about Plaintiffs Nora Phillips, Erika Pinheiro, and Al Otro Lado, including what the organization does, its mission, and its political outlook. *Id*. CBP also collected troves of records about Mr. Dennison's associations and private activities. 4-ER-487. Defendants also attempted to map out the connections and associations between Plaintiffs and other activists and organizations, without regard to whether any of the information contained therein was accurate or relevant to a potential crime. *Id*.

Based on these intelligence files, CBP personnel created a watchlist designed to collect critical information about these activists, including Plaintiffs, and distribute it widely to members of ICE and the FBI. 4-ER-487. The document is entitled "Suspected Organizers, Coordinators, Instigators, and Media," and lists

11

individuals, including Plaintiffs, with their names, dates of birth, citizenship status, alleged "role" within the migrant caravan, whether a travel "alert" was placed upon them, and whether they have been interviewed, had travel benefits restricted, or suffered some other adverse consequence at the border. *Id*. According to the head of the EOC at the time it was created, the creation of the watchlist was "problematic for a number of reasons" and "unprofessional." 4-ER-488.

All told, examples of the types of records Defendants created and stored about Plaintiffs include:

- Multiple "targeting lists" of "suspected organizers, coordinators, instigators, and media" that featured lineups of Plaintiffs (and others) with biographical information, relationships migrants, and notations concerning whether they have been interviewed by border officials or had "alerts" placed on their file (5-ER-813 & 7-ER-1253-67);

- A detailed spreadsheet identifying Mr. Dennison and Ms. Phillips (alongside other "leaders and organizers," "anarchists," "pro-caravan" individuals, and "media") and listing their biographical information, social media profiles, occupation, and addresses (6-ER-965-67, 6-ER-1042-44, 7-ER-1180-81, & 7-ER-1183-85);

- Another spreadsheet identifying Plaintiffs' associational activities and political opinions, including that Ms. Phillips and Ms. Pinheiro belong

to Al Otro Lado, an organization that "provides cross-border immigration legal services" and which "strongly opposes family separation at the border" (7-ER-1137-38);

- A detailed report documenting Al Otro Lado's history, mission, volunteers, and employees (including Ms. Phillips and Ms. Pinheiro) (7-ER-1253-67);

- A report concerning Mr. Dennison, including biographical information, occupation, information about his non-profit organization, and notations about his associations (7-ER-1315); and

- A chart of what CBP described as "ANTIFA subjects" visualizing the relationships and associations between Plaintiffs and other individuals and organizations, and listing their names and organizational affiliations (7-ER-1352-53 & 7-ER-1423-25).

Importantly, Defendants never had reasonable suspicion that Plaintiffs committed any crime, despite this dragnet collecting massive troves of information about them. 4-ER-488. Neither CBP nor ICE ever suspected Mr. Dennison of having committed a crime. *Id*. The only investigation the FBI conducted concerning the Plaintiffs was that of Mr. Dennison. *Id*. His investigation was predicted on the lowest level assessment, which generally may not require any suspicion of criminal wrongdoing to initiate. *Id*. That investigation concluded that

13

Mr. Dennison had not committed any crime and was merely "documenting the migrant caravans and the border region." *Id.*

Despite this, Mr. Dennison continued to be tracked by Defendants, including well past filing of this litigation. That came in the form of so-called "TECS" alerts or lookouts, which can monitor international port of entry crossings into the United States. 4-ER-489. So long as they are utilized in the course of an officer's official duties, there are no other limitations on placement of TECS alerts or lookouts, nor on querying the TECS system for information about an individual. *Id.* Mr. Dennison's travel across the United States continued to be monitored through TECS alerts or lookouts, notifying particular Border Patrol agents every time he crossed the border. *Id.* And consistent with the above practice, TECS alerts were used to initiate detentions and seizures at the border of individuals CBP identified as associated with the migrant caravans, including Mr. Dennison. *Id.*

Importantly, CBP intelligence officers had wide latitude to collect intelligence on targets without any meaningful limitation, review, or audit. 4-ER-490. No criminal suspicion or informal investigation of a target or individual ion is necessary for Border Patrol to collect information about them. *Id.* And Border Patrol did in fact collect vast troves of information about individuals believed to be associated with the migrant caravan, without suspecting any of them of criminal activity. *Id.*

14

The Border Patrol does not promulgate any written policy that limits in any way the kinds of intelligence that San Diego Sector Border Patrol agents can collect. 4-ER-490. And in the principal internal database used by Border Patrol to store this intelligence, no rules exist about what kind of data may be inputted into the system. *Id*. Nor do rules exist for how long intelligence can be maintained in the database. 4-ER-491. Intelligence files can be retained, therefore, in perpetuity. *Id*. When these records are created and, in the lexicon of the database, "published" for access by others, they generally cannot be amended. *Id*. Nor are these records ever audited for accuracy or investigative relevance upon publication. *Id*.

**B. Defendants subjecting of Plaintiffs to searches and arrests as a result of their surveillance program.**

In conjunction with and as a result of the wide-ranging surveillance program described above, the Defendant Agencies subjected Plaintiffs to searches and seizures at United States-Mexico border. Recited below are brief summaries of these stops and seizures.

*Nathaniel Dennison*. On January 11, 2019, Mr. Dennison attempted to travel to San Diego from Tijuana on foot at the San Ysidro Port of Entry. 4-ER-436. When he arrived at the port, CBP officers pulled him out of a line and escorted him into a holding area for detained travelers, apparently as a result of a hit on a computer-generated alert placed on his passport. 4-ER-438; *see* 7-ER-1306 (noting that Mr. Dennison was referred for a seizure "due to a computer generated alert

15

received on him"). CBP held him in that pen for more than six hours. 4-ER-438. Following the lengthy wait, officers escorted Mr. Dennison to another confined area and proceeded to interrogate him for approximately 45 minutes. 4-ER-439. During the examination, Mr. Dennison felt as though he was under arrest, unable to leave the room, and unable to refuse to answer questions. *Id.*; 4-ER-442. His interrogators demanded Mr. Dennison reveal personal biographical information, employment, associations, and his political beliefs (including by asking him whether he attended particular political protests within he United States). 4-ER-440-41. Mr. Dennison was eventually released, but not before his Mexican-issued visa was confiscated from him. 4-ER-442. Following this detention, Mr. Dennison continued to be monitored by Defendants, who would be alerted every time he crossed the border. 4-ER-489; *see* 8-ER-1381-1422.

*Nora Phillips.* On January 31, 2019, Ms. Phillips attempted to travel with her family via airplane to Mexico on a personal trip. 4-ER-448. Upon her arrival to the airport in Guadalajara, Mexico, Mexican officials detained and subsequently deported her back to the United States due to the suspected placement of a United States-issued alert on her passport. 4-ER-448-50; *see* 4-ER-685-88 (explaining how Mexican officials suggested to Ms. Phillips that the United States government was responsible for the travel alert).

16

*Erika Pinheiro.* On January 29, 2019, Ms. Pinheiro attempted to cross from the United States into Mexico, where she currently resides. 4-ER-455-56. During her crossing, Mexican immigration officials detained and deported her at the behest of the United States government. 4-ER-456-57. The next month, Mexican officials once again detained her at the border and informed her that the United States Government placed the alert on her passport, an act typically reserved for individuals with pending criminal matters or suspected of posing national security risks. 4-ER-457-58.

### C. The Department of Homeland Security's internal investigation of Defendants' surveillance program.

Following criticism from civil society organizations and members of Congress concerning Defendants' surveillance program, the Department of Homeland Security Office of Inspector General (OIG) announced on July 15, 2019 that it would conduct an internal investigation of Defendants' surveillance program. 2-ER-105-06. The Acting Inspector General stated that OIG would review the secret watch list to determine, *inter alia*, "why it was created, what it is used for, and what happened to the people named in it." *Id.* The OIG stated it "anticipate[s] reviewing other specific allegations of targeting and/or harassment of lawyers, journalists, and advocates, and evaluate whether CBP's actions complied with law and policy." *Id.*

17

More than two years later, and approximately three months after the district court awarded judgment to Defendants, the OIG issued its final report, entitled "CBP Targeted Americans Associated with the 2018-2019 Migrant Caravan," Office of Inspector General, Department of Homeland Security, Sep. 20, 2021, https://www.oig.dhs.gov/sites/default/files/assets/2021-09/OIG-21-62-Sep21.pdf.[1] The report stated that the OIG did "not conduct[] a legal analysis of the constitutional issues as they were generally outside DHS OIG's purview and the scope of this report." *Id.* at 3 n. 6. Nevertheless, OIG concluded that that while "CBP officials had legitimate reasons for placing lookouts on U.S. journalists, attorneys, and others suspected of organizing or being associated with the migrant caravan (caravan associates)," CBP "subjected some of these individuals to repeated and unnecessary secondary inspections" because CBP officials were "unaware of CBP's policy related to placing lookouts" and "did not remove lookouts promptly once they were no longer necessary." *Id.* at 4. The report also found that a CBP official "asked Mexico to deny entry to caravan associates, including 14 U.S. citizens," a request CBP "had no genuine basis" to make. *Id.*

---

[1] The content of records and reports of administrative and governmental bodies are proper subjects for judicial notice under Rule 201(d). *Interstate Natural Gas Co. v. S. Cal. Gas Co.*, 209 F.2d 380, 385 (9th Cir. 1953). A court may also take judicial notice of the contents of public records, like this OIG report. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).

OIG also found that CBP officials "may have asked Mexico to deny entry to these U.S. citizens, but [it] could not determine whether they did, because CBP personnel were not forthcoming about the disclosures, did not follow CBP policies on sharing information with foreign entities, and did not retain communication records." *Id.*

## II.    Procedural history

### A.    Plaintiffs' causes of action and prayer for relief.

Plaintiffs filed this action on July 23, 2019. Following two amendments to their original pleading, Plaintiffs' operative Second Amended Complaint alleged that the Defendant Agencies violated (1) all three Plaintiffs' First Amendment right to be free of unlawful government scrutiny based on their associations and political expressions and corollary right not to have the government demand or collect records about these associations and political activities, (2) Mr. Dennison's Fourth Amendment right to be free from unlawful search and seizure during his January 10, 2019 border crossing, and (3) the prohibition found in the federal Privacy Act, 5 U.S.C. 552a, that, among others, bars the government from maintaining records about individuals' First Amendment-protected activity without legitimate law enforcement justification. 2-ER-62-67.

Plaintiffs sought declaratory and injunctive relief for these violations, including an order expunging "all records unlawfully collected and maintained

19

about Plaintiffs," an injunction to "cease investigations into and surveillance of Plaintiffs based on First Amendment-protected activity without any reasonable suspicion criminal activity," and an injunction "to cease their suspicionless detentions, arrests, interrogations, and physical restraints of Plaintiff Nathaniel Dennison at the border unrelated to the border search exception to the Fourth Amendment." 2-ER-65-66. Plaintiffs also sought an order amending or expunging all records unlawfully maintained or possessed by Defendants in violation of the Privacy Act. *Id.*

### B. Plaintiffs' discovery motion seeking leave to take additional depositions.

Following the district court's denial of a motion to dismiss brought by Defendants, the parties began discovery by serving written discovery requests and initial disclosures pursuant to Rule 26(a)(1). Over a period of 68 days, Defendants served four different Rule 26(a)(1) disclosures identifying the following eleven witnesses "likely to have discoverable information . . . that the disclosing party may use to support its claims or defenses":

1.  Leonardo Ayala, Acting Assistant Chief Patrol Agent, Foreign Operations Branch, U.S. Customs and Border Protection;

2.  Christopher Cline, Supervisory Customs and Border Protection Officer, U.S. Customs and Border Protection;

3.   Stephen Crudale, Acting Patrol Agent in Charge, Sector Intelligence Unit, San Diego Sector Border Patrol, U.S. Customs and Border Protection;

4.   Roberto Del-Villar, Assistant Chief Patrol Agent, Foreign Operations Branch, San Diego Sector Border Patrol, U.S. Customs and Border Protection;

5.   Lea Disenso, HSI San Antonio Group Supervisor, U.S. Immigration and Customs Enforcement;

6.   Juan Rodriguez, Acting Watch Commander, San Diego Sector Border Patrol Headquarters, U.S. Customs and Border Protection;

7.   Jerod Ross, Chief Intelligence Officer, Integrated Border Intelligence Group, Federal Bureau of Investigation.

8.   Francisco Santos, Border Patrol Agent, U.S. Customs and Border Protection;

9.   David Shaw, HSI Assistant Director, National Security Investigations Division, U.S. Immigration and Customs Enforcement;

10.  Allen Tamayo, Customs and Border Protection Officer, U.S. Customs and Border Protection; and

11.  Roy Villareal, Chief Patrol Agent, Tucson Sector Headquarters, U.S. Customs and Border Protection.

*See* 3-ER-303-23 (all four Rule 26(a)(1) disclosures).

Plaintiffs twice sought leave of the district court to take additional depositions beyond the ten-deposition limit set forth in Federal Rule of Civil Procedure 30(a)(2) after Defendants refused to make any more than 10 witnesses available for deposition. First, on November 9, 2020, Plaintiffs applied *ex parte* for leave to conduct nine additional depositions beyond the ten authorized in Rule 30(a)(2). 3-ER-403-06 & 3-ER-280-96. In their memorandum in support of the application, Plaintiffs explained that they had deposed seven witnesses to date: five who appeared in Defendants' disclosures, one government employee who did not appear on the disclosures, and one third party (a former ICE officer whose leak of Defendants' surveillance program led up to the filing of this action). At the time, Plaintiffs intended, but had not yet taken, three Rule 30(b)(6) depositions of each Defendant Agency. In their Application, Plaintiffs detailed the identities of the prospective deponents, their relevance to Plaintiffs' claims, and the necessity of the testimony Plaintiffs expect to elicit from them. 3-ER-284-89.

In response, Defendants broadly argued that the legal questions in this "uncomplicated" case are "clear-cut," that Plaintiffs were already the beneficiaries of voluminous written discovery, and that "the burden and expense of such [additional] discovery would far outweigh any likely benefit." 2-ER-75-76. Defendants did not respond to the specific justifications Plaintiffs offered for each

of the depositions, simply stating, without more, that "further depositions would be both redundant and excessive." 2-ER-77.

**C.    Discovery concerning the Office of Inspector General's investigation.**

At the same as the parties disputed Plaintiffs' need for additional depositions, they also disputed the discoverability of information concerning the then-ongoing OIG investigation into Defendants' surveillance program.

In their first set of written document demands served on April 23, 2020, Plaintiffs sought "All Documents, including Communications, provided to the DHS Office of the Inspector General in connection with the internal investigation announced on July 15, 2019," and "All Documents provided to or generated by the Department of Homeland Security's Office of Inspector General relating to its investigation of the OSL Targeting List." 2-ER-88; *see* 2-ER-117 & 2-ER-119. In response, Defendants asserted "the law enforcement privilege, the deliberative process privilege, or other applicable privileges or protections from disclosure," noting that "the precise documents submitted to the DHS OIG would reveal the direction of an ongoing investigation." 2-ER-135 & 2-ER-143.

Defendants completed their production of documents on August 10, 2020, and served their final privilege log on August 21. 2-ER-88; *see* 2-ER-148-239. The log described dozens of documents withheld on deliberative process grounds

pertaining to the OIG's investigation, all of which broadly fell into the following categories of records:

1. Correspondence between agency officers and officials, but not including OIG personnel, which Defendants marked as "Provided in response to OIG request for materials." The following are some examples:

   a. A series of messages to and from CBP officers, including the author of the secret watchlist Juan Rodriguez (not including OIG), entitled "Re: organizers clean.pptx" (2-ER-190, lines 498–501);

   b. A document created by an agency employee entitled "Surveillance Notes.01.15.2019," which was created a few days after the secret watchlist was authored (*Id.*, line 508);

   c. A message from a Border Patrol intelligence analyst Teri Cochran to a CBP colleague and copying other non-OIG personnel entitled "FW: Nicole Ramos" (Ms. Ramos is a co-director of the legal organization that Plaintiffs Nora Phillips and Erika Pinheiro also serve as directors of) (*Id.*, line 495);

   d. A message about the "suspected organizers" identified in the secret watch list forwarded by Roberto Del-Villar to members

of the OIG, the supervisory Border Patrol agent responsible for
tasking a subordinate to create the list (2-ER-195, line 505);

e.  A document entitled "Situational Review 02_07_2019"
exchanged between CBP Border Patrol lists (not including
OIG) (*Id.*, line 556);

2.  Correspondences between CBP and OIG personnel marked as
"Response to OIG request for materials," and which appear to relay
information to OIG personnel (*see, e.g.*, 2-ER-196-203, lines 560,
567, 569, 572, 580, 588–89, 592–93, 614, and 661).

3.  Correspondences between CBP personnel and OIG labeled only as
"Email Exchange that is part of active and ongoing OIG
investigation", without stating more about the nature of the messages
and why they may be privileged (*see, e.g.*, 2-ER-193-195, lines 530–
33, 538–39, 541–544).

4.  Miscellaneous documents provided to the OIG but not listed with
adequate information to appraise the privilege assertion, examples of
which include:

a.  Documents entitled "Redacted.pdf" by various authors, and not
sent to or from any individual, which Defendants identified as
"[p]rovided in response to OIG request for materials" (*see, e.g.*,

25

2-ER-194-206, lines 534–35, 590, 656–657, 659, 663, 667, 693, 696, 708, 711)

b.   Documents with no authors, senders, or recipients identified, which Defendants identified as "[p]rovided in response to OIG request for materials" (*see, e.g.*, *id.*, lines 521, 559, 574, 587, 683, 740).

Following production of the privilege log, the parties began deposing witnesses. The first deponent represented by Defendants was Juan Rodriguez, a CBP Border Patrol officer who created the secret watchlist that gave rise to this litigation. 2-ER-90. During his deposition, Mr. Rodriguez testified that while he created the list based on information that existed in a database accessible to Border Patrol officers, he did not compile the underlying information, did not know why he was tasked with creating the secret list, and did not know what his superiors did with the list he created. 2-ER-259, 2-ER-260-62. He also testified that his tasking order came verbally, and that no documentary record of it existed. 2-ER-263-64. When asked with whom he had spoken about the secret watchlist, he reported that OIG interviewed him. 2-ER-265. At that point, Mr. Rodriguez's counsel stated that while he could allow Mr. Rodriguez to testify about when that interview was, he would instruct Mr. Rodriguez not to answer "as to any further questioning as to the content of that meeting." 2-ER-266-67. The parties' counsel then described the

nature of their disagreement about the viability of the deliberative process assertion, including that Defendants' counsel intended to withhold "factual information [Mr. Rodriguez] provided to the inspector general investigators who would have interviewed him." 2-ER-280-84. Defendants' counsel subsequently instructed Mr. Rodriguez not to answer questions about how many times OIG interviewed him, 2-ER-269-73, or how many other individuals were present during the one interview he referenced, 2-ER-273-74.

Following a subsequent conference concerning the disputed written discovery and oral deposition questions, Plaintiffs wrote to counsel for Defendants in an effort to assess the propriety of Defendants' privilege assertion, seeking answers to the following questions concerning "OIG's mandate for its investigation":

- Can you provide any information or summary about OIG's mandate for its investigation (e.g. subject matter of the investigation, the agencies being investigated, or any other relevant information)?
- Can you provide any estimated date of completion for the OIG investigation?
- Can you provide any information about the anticipated product of the investigation?
- Can you provide any information about who will be briefed about the product of the investigation upon completion, if it is completed?
- Other than what you provided to us in our last meet and confer, your email below, and anything in resposne [sic] to the above, is there any additional information you're willing to provide about the OIG

27

investigation as a proffer that may be relevant to this
dispute?

2-ER-245-55. Defendants never responded to this request. 2-ER-103 at ¶ 16.

Plaintiffs subsequently applied *ex parte* to the district court for the OIG-related

documents and for testimony concerning the OIG investigation. 2-ER-275-78 & 2-

ER-83-98.

### D. The district court's ruling on discovery disputes and summary judgment motions.

In response to Plaintiffs' seeking court intervention on both the deposition

and OIG discovery disputes, the district court set a status conference to "take up

the issues raised by the ex parte applications." *Phillips v. U.S. Customs and Border*

*Protection*, No. 2:19-cv-06338-SVW-JEM (C.D. Cal. Nov. 18, 2020), ECF No. 68.

Following this status conference, the district court issued an order on November

30, 2020 deferring its decision on the parties "discovery dispute . . . until after

review of the Motion for Summary Judgment, and the opposition, thereon." 1-ER-

26. The court set the deadline for filing summary judgment motions for 40 days

from the date of the order. *Id.* The district court did not rule on the OIG dispute.

Defendants eventually moved for summary judgment on February 26, 2021,

arguing that Plaintiffs lacked standing to seek either prospective injunctive relief or

expungement, and seeking judgment on the merits of both constitutional claims

and Plaintiffs' Privacy Act claims. 10-ER-2066-68. In response, Plaintiffs filed an

28

opposition based on Rule 56(d), arguing that Defendants' motion was premature considering the additional necessary depositions that Defendants refused to provide, as well as the outstanding OIG-related discovery yet to be ruled upon. 10-ER-1991-2011. Between their filing the original request for additional depositions and the time they filed their summary judgment opposition, Plaintiffs conducted three of the originally requested nine additional depositions. *Id*. In their Rule 56(d) opposition, Plaintiffs sought only six additional depositions via their Rule 56(d) opposition (down from their original nine), as follows:

1. *Allen Damayo and Christopher Cline (Nathaniel Dennison's CBP interrogators)*. Plaintiffs learned that Mr. Damayo and Mr. Cline are the two CBP officers who detained and interrogated Plaintiff Nathaniel Dennison during the January 2019 arrest at the border which gave rise to Mr. Dennison's Fourth Amendment claim. 10-ER-2006; 3-ER-287-88. Although Plaintiffs had access to a brief written account of Mr. Dennison's arrest, that report did not reveal critical information such as the length of time of his detention, a full accounting of the interview questions he was asked, or a recounting of the circumstances of his detention and seizure (including whether he was physically restrained, which he testified he was). *Id.*; *see* 3-ER-1303-11 (report of Mr. Dennison's interrogation). Plaintiffs explained

29

that these depositions were particularly critical given Defendant CBP destroyed internal video footage of Mr. Dennison's detention. 3-ER-288; *see* 3-ER-351-52 (correspondence from Defendants' counsel regarding destruction of video footage).

2. *Roberto Del-Villar (Border Patrol supervisor responsible for creation of Government watchlist)*. Mr. Del-Villar was the Assistant Chief Patrol Agent within the Foreign Operations Branch of San Diego's Border Patrol sector, and commissioned the creation of the secret watchlist that serves as the foundation for this litigation. 2-ER-288. The creator of the Government watchlist testified that he did not know why Mr. Del-Villar tasked him with creating the watchlist, the purpose of the watchlist, or how Mr. Del-Villar used it. *Id*. Plaintiffs explained that his deposition was required to understand, among other questions, how and why the Government targeted Plaintiffs for scrutiny, and what the purpose of this document was. *Id*.

3. *Jazmin Castillo and Teri Cochran (CBP intelligence officers)*. Ms. Castillo and Ms. Cochran were CBP employees who appear to have worked in a Border Patrol intelligence unit and were responsible for conducting or collecting most of the intelligence gathered on Plaintiffs. 2-ER-290-91 & 10-ER-2001-10. This included one 131-

30

page record detailing vast tranches of information circulated between Defendants about, among others, Mr. Dennison, Al Otro Lado (the organization led by Plaintiffs Nora Phillips and Erika Pinheiro), their associates, and other individuals Defendants linked to the migrant caravans. 10-ER-2000-01; *see, e.g.*, 9-ER-18-1788-1913 (131-page intelligence record). Given the breadth of information compiled by these two officers, Plaintiffs sought their testimony in order to understand the nature of Defendants' investigations of Plaintiffs, their purpose, and the justifications for this intelligence collection.

4.    *Leonardo Ayala (Senior Border Patrol official).* The Government identified Mr. Ayala as the Acting Assistant Chief Patrol Agent of Border Patrol's Foreign Operations Branch who "has knowledge regarding the creation of the Power Point presentation and its use." Based on the testimony of the creator of the Government's secret watchlist, Plaintiffs reasonably suspect that Mr. Ayala possesses important information concerning Defendants' surveillance and investigation of them. 3-ER-291-92. As with much of the evidence gleaned by Plaintiffs in discovery, the information Mr. Ayala possesses concerning them did not appear anywhere else in the documentary record, thereby necessitating his deposition.

Building on their original request for additional depositions, Plaintiffs' Rule 56(d) opposition explained with particularity how these six depositions related to Plaintiffs' legal theories, why the depositions were necessary to oppose the Government's summary judgment motion (including to establish standing to seek injunctive relief), and how Plaintiffs were diligent in seeking them. 10-ER-1999-2010. Plaintiffs' Rule 56(d) opposition also addressed the parties' then-outstanding dispute concerning the discoverability of information concerning the OIG investigation and report. 10-ER-2009-10.

In a short order, the district court denied Plaintiffs' Rule 56(d) request, ruling only that Plaintiffs' "Rule 56(d) request fails to identify specific facts to be elicited through further discovery or describe how further discovery will yield facts essential to opposing summary judgment." 1-ER-72. The district court provided no further elaboration on its reasoning. It also did not address the parties' outstanding dispute concerning the OIG investigation.

Following the district court's denial of Plaintiffs' Rule 56(d) request, Plaintiffs filed their formal opposition to Defendants' Motion for Summary Judgment, arguing that, as relevant here, Plaintiffs have standing to seek both expungement and prospective injunctive relief. 8-ER-1595-97. Plaintiffs argued that the mere existence of unlawfully collected information about their private

32

associations and expressive activity constitutes ongoing, irreparable injury that confers standing to challenge the records' creation.

On June 22, 2021, the district court issued a written order granting Defendants' summary judgment motion. 1-ER-2-23. On Plaintiffs' two constitutional claims, the district court held that Plaintiffs lack standing to assert both claims. Addressing first Plaintiffs' request for prospective injunctive relief, the district court held that "[n]one of the Plaintiffs have put forth evidence supporting a likelihood of future injury, or ongoing injury, that is fairly traceable to the governmental conduct at issue in this case." 1-ER-11.

On Plaintiffs' expungement theory of standing, the district court prefaced its decision by stating that "[t]here is scant authority addressing how Article III standing requirements apply to requests for expungement." 1-ER-14. It went on to canvass existing precedent on expungement, concluding that "Plaintiffs must still show an injury in fact to demonstrate standing to seek expungement." 1-ER-17. In reviewing the record, the court ruled that Plaintiffs failed to do so, because they "pointed to no evidence suggesting that their inclusion on the caravan document, or in any other intelligence product, constitutes an ongoing injury or poses any likelihood of future injury." *Id*. The court further stated that Plaintiffs lacked standing to expunge any such records because they "have not argued . . . that Defendants collected records about them that are so sensitive that their retention

33

alone constitutes a continuing injury or produces a chilling effect on their First Amendment-protected activity." *Id.* Finally, the district court concluded that Plaintiffs had failed to meet the redressability requirement of Article III standing by not "explain[ing] how any chilling effect is even exacerbated by Defendants' continued retention of records," stating that Plaintiffs have not presented any evidence that the records will make it more likely they will be investigated in the future or that expungement "would minimize any fear Plaintiffs currently experience." *Id.*

Finally, the district court awarded judgment to Defendants on Plaintiffs' Privacy Act claims, holding variously that Plaintiffs' claims were either unexhausted, inapplicable to ICE and the FBI, or inappropriate for injunctive relief. 1-ER-18-21.

Plaintiffs timely appealed. 3-ER-407-08.

## SUMMARY OF THE ARGUMENT

Plaintiffs challenge three broad issues on appeal: the district court's management of two important discovery disputes between the parties; and the district court's ruling rejecting Plaintiffs' claim to Article III standing to seek expungement of the records they allege Defendants unconstitutionally maintain about them.

*First*, the district court's failure to rule on the discoverability of records and testimony concerning the Department of Homeland Security's OIG investigation justifies reversal. It is well settled that a district court enjoys no discretion to ignore a litigant's timely filed discovery motion that concerns matters important to their claims or defenses. Here, the district court did precisely that by refusing to decide the dispute at all prior to awarding judgment to Defendants.

Importantly, Plaintiffs' request for facts surrounding the OIG's investigation would have revealed important information to this litigation, including further details about how and why Defendants targeted U.S. citizens like Plaintiffs for intelligence gathering and detentions at the border, Defendants' policies and procedures governing such programs, and their data-sharing arrangements with foreign governments, to name a few. The OIG's eventual findings, published two months after Plaintiffs filed this appeal, reveal just how wide ranging its investigation was, and how relevant it was to the issues in dispute here. Regardless

35

of the merits of the discovery dispute, Plaintiffs were entitled to a decision from the court on the question.

*Second*, the district court abused its discretion when it deferred decision on, then ultimately rejected, Plaintiffs' request for additional, necessary depositions of percipient witnesses identified by Defendants. Just as with the OIG dispute, Plaintiffs timely raised their need for more depositions beyond the ten afforded by the Federal Rules with the Court.

Following briefing of the issue, the district court deferred ruling on the discovery motion, and summarily denied Plaintiffs' request for additional deposition made in the form of a Rule 56(d) opposition. This was an abuse of discretion. Plaintiffs' requests seeking these additional depositions, originally supported by an affidavit signed under oath, described in detail why each deposition was necessary to a fulsome understanding of the facts at issue in this case, and how the written discovery record could not reveal all the information necessary to litigate this complex, multi-party case. That Defendants themselves conceded the relevance and importance of each deponent lends further support to the necessity of the depositions, especially given the complex nature of this multi-plaintiff, multi-defendant action.

*Third*, the district court's order rejecting Plaintiffs' claim to Article III standing misconstrued established case law on requirements a litigant must show to

seek expungement. The district court refused to appreciate the ongoing irreparable injury associated with Defendants' continued maintenance of records about Plaintiffs' private associations and expression—information that courts have repeatedly held as sacrosanct to the First Amendment. Instead, the district court's demand that Plaintiffs provide evidence of some *additional* injury that may hypothetically arise from Defendants' illegal retention of these records finds no basis in the law. So long as Defendants continue to possess these records, they inflict a recognized injury-in-fact to Plaintiffs, caused by Defendants' own conduct targeting Plaintiffs, and redressable only through the records' destruction. Article III therefore supports Plaintiffs' claim for expungement, and the district court's standing ruling should be reversed.

## STANDARD OF REVIEW

Although this Court "typically review[s] a district court's discovery rulings for abuse of discretion," *R & R Sails, Inc. v. Ins. Co. of Pa.*, 673 F.3d 1240, 1245 (9th Cir. 2012), when "the question is not whether the district court properly exercised its discretion under a federal rule, but rather turns on the legal issue of whether the court properly interpreted the rule's requirements," this Court reviews such questions de novo. *Republic of Ecuador v. Mackay*, 742 F.3d 860, 864 (9th Cir. 2014).

This Court also reviews "de novo the district court's grant of summary judgment." *Oswalt v. Resolute Indus., Inc.*, 642 F.3d 856, 859 (9th Cir. 2011). In so doing, it must "determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Wallis v. Princess Cruises, Inc.*, 306 F.3d 827, 832 (9th Cir. 2002).

Where appropriate, "a trial court may order a continuance on a motion for summary judgment if the party requesting a continuance submits affidavits showing that, without Rule 56 assistance, it cannot present facts necessary to justify its claims." *Fam. Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*, 525 F.3d 822, 827 (9th Cir. 2008). Federal Rule of Civil Procedure 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons,

it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." If such a showing is made in good faith, "a district court should continue [the] summary judgment motion." *State of Cal., on Behalf of California Dep't of Toxic Substances Control v. Campbell*, 138 F.3d 772, 779 (9th Cir. 1998).

This Court reviews a district court's decision on a Rule 56(d) request for abuse of discretion. *Id*. But "if a district court implicitly denies a Rule 56(d) motion by granting summary judgment without expressly addressing the motion, that omission constitutes a failure to exercise its discretion with respect to the discovery motion, and the denial is reviewed de novo." *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 677 (9th Cir. 2018) (internal quotations and citation omitted).

## ARGUMENT

**I.** **The district court's failure to rule on Plaintiffs' pending discovery disputes and failure to award additional needed discovery warrants reversal of summary judgment.**

For two separate and independent reasons, the district court's award of summary judgment should be vacated, and discovery should be re-opened. First, the district court lacked discretion to award summary judgment to Defendants without ruling on a pending discovery dispute concerning the OIG's investigation into Defendants' conduct. Second, the district court abused its discretion to defer ruling on, then ultimately denying, Plaintiffs' request for additional, necessary depositions of witnesses Defendants themselves identified as holding relevant and important information to this case.

### A. The district court lacked discretion to ignore a pending discovery dispute ripe for decision prior to awarding summary judgment to Defendants.

The district court's failure to rule on the parties' fully briefed, ripe discovery dispute concerning the OIG investigation into Defendants' surveillance and seizure practices warrants this Court's reversal of the summary judgment decision below. Ordinarily, a trial court's discovery decisions are reviewed for abuse of discretion. *R & R Sails, Inc.*, 673 F.3d at 1245; *Garrett v. City & Cnty. of San Francisco*, 818 F.2d 1515, 1518 (9th Cir. 1987) (noting that a "trial court's exercise of discretion will rarely be disturbed"). But, just as in *Garrett*, "[t]his case, however, involves

the failure of the trial court to exercise its discretion, not the abuse of it." *Id.* When a district court either knowingly or otherwise neglects to rule on a pending discovery motion, it "fail[s] to exercise its discretion with respect to the discovery motion." *Id.* (citing cases); *cf. Stevens*, 899 F.3d at 677 ("When the district court denies a motion to compel additional discovery as moot without considering its merits, however, the district court does not exercise any substantive discretion about the scope of discovery, so we review the denial of discovery de novo.").

To illustrate the error of the decision below, the facts in *Garrett* are worth recounting. *Garrett* concerned a Title VII challenge to a San Francisco firefighter's discharge following a municipal commission's finding that the plaintiff had violated a certain fire department policy concerning the discovery of valuables at the scene of a fire. During discovery, the plaintiff served the defendants with requests for the production of personnel files of sixteen named firefighters. The defendants objected to the request on the grounds that the files were irrelevant, privileged, confidential, and that their disclosure would constitute an invasion of privacy. The plaintiff timely moved to compel their production approximately three weeks after defendants had moved for summary judgment. The district court was to hear both motions at a hearing approximately one month after the motion to compel was filed. During the hearing, the district court granted defendants'

summary judgment motion, then "denied Garret's discovery motion as 'moot' without considering it on the merits." *Garrett*, 818 F.2d at 1518.

Without passing on the merits of the discovery motion, this Court reversed the judgment, holding that the district court lacked discretion to deny the pending motion as moot since "the discovery motion was sufficient to raise the issue of whether he should be permitted additional discovery." *Garrett*, 818 F.2d at 1518. Even though the discovery motion "did not seek broad additional discovery," the fact that judgment was awarded in part due to lack of evidence of disparate treatment obligated the district court to at least address the motion. *Id.*

The same is true here. Plaintiffs were entitled to a decision on their fully briefed, pending discovery motion. The district court's failure to address it constituted legal error, irrespective of its merits. Plaintiffs explained in detail the relevance and importance of the subject discovery, both in their original application seeking the discovery and in their Rule 56(d) objection to Defendants' Motion. *See, e.g.*, 2-ER-94 (explaining that the investigation's focus on why Defendants' secret program was created, what it was used for, and what happened to the people named in it is critically important to the case); 10-ER-2008-09 (explaining the relevance of the OIG discovery to determining current policy and the necessity of prospective injunctive relief). The fact that the eventual OIG report made several important and new findings directly relevant to this litigation—

42

including that CBP officials may have shared information about U.S. citizens with their Mexican counterparts and sought to deny the citizens' entry to Mexico, as Plaintiffs alleged, and that CBP officials subjected some U.S. citizens to "repeated and unnecessary secondary inspections," also as Plaintiffs alleged—lends further importance to this requested discovery. In the face of these arguments, the district court's refusal to address them constituted error that warrants reversing the award of judgment and re-opening discovery.

Importantly, this was not a situation where the district court's error could be excused. Plaintiffs did not pursue the OIG evidence or seek the records concerning the investigation *after* the passage of discovery deadlines or the grant of summary judgment. *Clark v. Cap. Credit & Collection Servs., Inc.*, 460 F.3d 1162, 1179 (9th Cir. 2006) (litigants' diligence in seeking the discovery militated in favor of reversing judgment). When litigants like Plaintiffs "actively pursued the information," and "also requested that the summary judgment motions be continued pending the completion of discovery, . . the district court was required to determine the merits of [Plaintiffs'] pending discovery motion before ruling on the summary judgment motion[]." *Id.*

**B.** **The district court improperly denied Plaintiffs' request for additional depositions.**

Separate and apart from failing to rule on the OIG dispute, the district court improperly denied Plaintiffs further discovery when it refused their request under Rule 56(d) for additional depositions necessary to oppose summary judgment.

"[A] trial court may order a continuance on a motion for summary judgment if the party requesting a continuance submits affidavits showing that, without Rule 56 assistance, it cannot present facts necessary to justify its claims." *Fam. Home & Fin. Ctr., Inc.*, 525 F.3d at 827. Rule 56(d) in turn provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d). If such a showing is made in good faith, "a district court should continue [the] summary judgment motion." *Campbell*, 138 F.3d at 779.

Here, the district court erred when it concluded that Plaintiffs failed to identify specific and necessary facts sought through further discovery. The basis for the district court's denial of Plaintiffs' Rule 56(d) was only Plaintiffs' purported failure to identify specific facts sought through further discovery and

44

their failure to demonstrate how these facts were necessary to opposing summary judgment.[2] Both conclusions were erroneous.

First, in both their original Application seeking the extra depositions as well as in their Rule 56(d) objection, Plaintiffs set out in detail the information they anticipated collecting through the additional discovery, and how the information is relevant to both their substantive claims as well as their sought-after relief. For instance, Defendants refused to make available both of Mr. Dennison's January 2019 interrogators. As Plaintiffs explained, the written discovery Defendants provided gave Plaintiffs access only to a brief description of the interrogation, despite it lasting for 45 minutes. The report leaves out critical information, including the full range of interview questions the interrogators asked him, why he was asked those questions, what, if anything, the interrogators did with the answers to those questions, and why he was detained at all. Plaintiffs explained that these depositions were particularly critical given Defendant CBP destroyed internal video footage of Mr. Dennison's detention. 3-ER-288; *see* 3-ER-351-52.

Similarly, Plaintiffs explained that the other proposed deponents also held information critical to Plaintiffs' claims. Mr. Del-Villar, for instance, was the

---

[2] Although the Government argued that Plaintiffs lacked diligence in seeking this additional discovery through other discovery devices and in other depositions, 8-ER-1612-19, the district court did not rely on this argument. Plaintiffs therefore do not address it here.

senior Border Patrol official who tasked a subordinate to create the secret watchlists of activists, organizers, and journalists that listed Plaintiffs. The subordinate who created the list testified that he followed Mr. Del-Villar's orders, but did not know why Mr. Del-Villar wanted the watchlist, what the purpose of it was, and what Mr. Del-Villar and other senior officers did with it upon its creation. Plaintiffs anticipated asking Mr. Del-Villar all these questions, as only he would be able to answer them with full confidence. *Garrett*, 818 F.2d at 1519 (Rule 56(d) request is ordinarily to be granted when information sought is solely in the possession of the defendant).

Likewise, Plaintiffs intended to question Ms. Castillo and Ms. Cochran about the troves of data they collected about Plaintiffs, including why they created records about Mr. Dennison, Al Otro Lado (the organization led by Plaintiffs Nora Phillips and Erika Pinheiro), their associates, and other individuals the government thought connected with the migrant caravans, and why those intelligence products were created despite Defendants lacking any suspicion that Plaintiffs' committed any crimes. Given the breadth of information compiled by these two officers, Plaintiffs sought their testimony to understand the nature of Defendants' investigations of Plaintiffs and their purpose.

Second, Defendants can have no viable argument for refusing to provide these extra deponents, given that they themselves identified all but one (Teri

Cochran) as possessing relevant, discoverable information about the case that they themselves may rely upon to support their defenses. As such, Plaintiffs' demand for additional depositions was premised on much more than "pure speculation." *Campbell*, 138 F.3d at 779. Given that Plaintiffs cannot "predict with accuracy precisely what further discovery will reveal," that Defendants themselves identified the deponents as critical to this case was reason enough for the district court to allow further discovery. *Stevens*, 899 F.3d at 678.

Third, the district court's refusal to provide any reasoning for its holding denying additional discovery is further reason to reverse. As this Court has previously stated, "when the plaintiff requests additional discovery pursuant to Rule 56(d) and the materials that a motion to compel sought to elicit are relevant to the basis for the summary judgment ruling, district courts should provide reasons for denying the discovery motion and the Rule 56(d) request." *Stevens*, 899 F.3d at 677. The district court here failed to do so, providing only a one-sentence conclusory order denying Plaintiffs' opposition.

Fourth, and finally, the nature of this multi-plaintiff, multi-defendant case makes Plaintiffs' demand for an enlargement of depositions eminently reasonable under the circumstances. Lower courts ordinarily grant relief from the ten-deposition rule enshrined in the Local Rules "where the complexity of the case clearly warranted more than ten depositions." *Couch v. Wan*, No. 1:08CV1621

LJO DLB, 2011 WL 4499976, at *1 (E.D. Cal. Sept. 27, 2011). Where, as here, the case involves multiple incidents, multiple plaintiffs, three large government agencies, and claims of serious constitutional error, the district court's denial of the extra discovery allotment was manifestly unjust and an abuse of discretion.

***

The district court's management of the parties' discovery disputes alone warrant this Court's reversal of the grant of summary judgment, and a re-opening of discovery for additional depositions and for resolution of the OIG dispute.

## II. The ongoing retention of records containing private information about Plaintiffs' protected associations and expression constitutes irreparable harm that confers standing to seek expungement.

This Court should reverse the legal error made by the district court in refusing to recognize Plaintiffs' Article III standing to seek expungement of records Defendants unlawfully amassed about them, their associations, and their protective activities. The existence of these records, which Plaintiffs allege came because of unconstitutional surveillance and seizures, constitutes an ongoing, irreparable injury that confers standing to challenge them.

Specifically, Plaintiffs satisfy the three basic elements of Article III standing: (1) an "injury in fact" that is "concrete and particularized" and "actual or imminent," not "conjectural" or "hypothetical"; (2) a "causal connection" between the injury and the defendant's conduct; and (3) a likelihood that a favorable

48

decision will "redress[]" the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Although the district court claimed that "[t]here is scant authority addressing how Article III standing requirements apply to requests for expungement," 1-ER-14, the opposite is in fact true. Courts have long recognized federal courts' inherent authority to expunge records obtained in violation of a multitude of constitutional rights, and have held that the maintenance of such records constitutes the type of irreparable injury-in-fact that confers standing.

As background, expungement is an equitable remedy available to remedy the type of constitutional violations Plaintiffs argue the Government conducted here. 1-ER-15. This Court has "repeatedly and consistently recognized that federal courts can order expungement of records, criminal and otherwise, to vindicate constitutional rights." *Fazaga v. Fed. Bureau of Investigation*, 965 F.3d 1015, 1053 (9th Cir. 2020) (en banc), *rev'd on other grounds*, 142 S. Ct. 1051 (2022); *Fendler v. U.S. Parole Comm'n*, 774 F.2d 975 (9th Cir. 1985) (holding expungement available where necessary to vindicate constitutional rights); *Shipp v. Todd*, 568 F.2d 133, 134 (9th Cir. 1978) ("It is established that the federal courts have inherent power to expunge criminal records when necessary to preserve basic legal rights."). Although this remedy is only "reserved for unusual or extreme cases," such cases include "where the arrest itself was an unlawful one, or where the arrest represented harassing action by the police, or where the statute under which the

49

arrestee was prosecuted was itself unconstitutional." *Shipp*, 568 F.2d at 134 n.1; *United States v. Smith*, 940 F.2d 395, 396 (9th Cir. 1991) (expungement available when the challenged conduct is "unlawful or invalid," or when the "government engaged in any sort of misconduct" that created the ill-gotten records). Where, as here, an unlawful or unconstitutional act resulted in the creation of the record, the plaintiff can seek expungement as an equitable remedy. *See, e.g.*, *Fazaga*, 965 F.3d at 1053 (expungement of surveillance records); *Maurer v. Pitchess*, 691 F.2d 434, 437 (9th Cir. 1982) (arrest records); *Shipp*, 568 F.2d at 134 (same); *Burnsworth v. Gunderson*, 179 F.3d 771, 774–75 (9th Cir. 1999) (prison disciplinary records).

The law in this Circuit recognizing the availability of expungement as a remedy is consistent with that in sister circuits that have addressed the question. *See, e.g.*, *Abdelfattah v. U.S. Dep't of Homeland Sec.*, 787 F.3d 524, 534 (D.C. Cir. 2015) (recognizing availability of expungement for "both violations of the Privacy Act and the Constitution"); *Sealed Appellant v. Sealed Appellee*, 130 F.3d 695, 698 (5th Cir. 1997) (litigant who "assert[s] an affirmative rights violation by the executive actors holding the records" of a conviction may seek expungement "when no other remedy existed to vindicate important legal rights."); *Clarkson v. I.R.S.*, 678 F.2d 1368, 1370 (11th Cir. 1982) ("[C]ourts have often recognized actions arising under the Constitution for expungement of agency records collected and maintained in violation of the First Amendment."); *Tabbaa v. Chertoff*, 509

50

F.3d 89, 96 n.2 (2d. Cir. 2007) ("[P]laintiffs possess Article III standing based on their demand for expungement.").

What, then, is the relationship between expungement as a *remedy* and expungement as a vehicle for *standing*? It is here the district court made its error of law, holding that in order to have standing, Plaintiffs were required to demonstrate ongoing or future risk of *some additional* injury attributable to the maintenance of the illegally-obtained records. But this "records plus more" rule finds no support in the case law, and must be reversed. To the contrary, the mere existence of records collected in violation of Plaintiffs' constitutional rights, and revealing Plaintiffs' First Amendment-protected activities, constitutes an ongoing injury that satisfies each of the three requirements for Article III standing.

### A. The Government's possession of ill-gotten information about Plaintiffs constitutes an injury-in-fact.

First, the district court erred in refusing to find that the existence of illegally-obtained records constitutes an injury-in-fact. "To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (internal quotation marks omitted). For an injury to be "concrete," it must be "real," i.e., not "abstract," but need not be "tangible." *Id*. at 339–40. "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Id*.

51

at 339 (quoting *Lujan*, 504 U.S. at 560 n.1). So long as Defendants themselves collected information about Plaintiffs through allegedly unconstitutional means, Plaintiffs have established injury-in-fact. *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 147 (2d Cir. 2011) ("To establish an injury in fact—and thus, a personal stake in this litigation—[Amidax] need only establish that its information was obtained by the government.") (internal quotation and citation omitted).

The district court erred as a matter of law when it held that notwithstanding the ongoing retention of information unlawfully obtained by the Government, "Plaintiff must still show an injury in fact to demonstrate standing to seek expungement." 1-ER-17; *see id.* ("Plaintiffs have pointed to no evidence suggesting that their inclusion on the caravan document, or in any other intelligence product, constitutes an ongoing injury or poses any likelihood of future injury.").

This holding conflicts with controlling Ninth Circuit law, and must be reversed. "The mere compilation by the government of records describing the exercise of First Amendment freedoms creates the possibility that those records will be used to the speaker's detriment, and hence has a chilling effect on such exercise." *MacPherson v. IRS*, 803 F.2d 479, 484 (9th Cir. 1986) (quoting *Nagel v. U.S. Dep't of Health, Education, and Welfare*, 725 F.2d 1438, 1441 (D.C.Cir. 1984)). *MacPherson* made clear that a victim need not show any further risk of

future harm that may come from the maintenance of unconstitutionally-obtained records in order to destroy them. Rather, the storage of records obtained in violation of the Constitution *itself* constitutes a legal injury, or at a minimum is sufficient to support a claim for equitable relief from unconstitutional conduct. *Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1275 (9th Cir. 1998) ("[e]ven if the continued storage, [of medical information obtained] by unconstitutional means does not *itself* constitute a violation of law, it is clearly an ongoing 'effect'… and expungement of the test results would be an appropriate remedy") (internal quotations omitted); *see also Menard v. Saxbe*, 498 F.2d 1017, 1023–24 (D.C. Cir. 1974) (holding that maintenance of file alleges "cognizable legal injury" even though plaintiff "cannot point with mathematical certainty to the exact consequences of his criminal file"); *Paton v. La Prade*, 524 F.2d 862, 868 (3d Cir. 1975) (noting the "dangers inherent" in storing records that "[t]he maintenance of [which] results in 'injuries and dangers' that are 'plain enough,'" including that the "file possibly could endanger [plaintiff's] future educational and employment opportunities.") (quoting *Sullivan v. Murphy*, 478 F.2d 938, 970 (D.C. Cir. 1973)).

Considering this well-established law, the district court should have presumed an injury-in-fact when the government collects and retains information in violation of the First and Fourth Amendments. In the First Amendment context,

for instance, decades of constitutional jurisprudence teaches that the government may not compel the disclosure of First Amendment-protected activity, like membership in the NAACP or association with the National Rifle Association. *See NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 460–62 (1958); *Nat'l Rifle Ass'n of Am. v. City of Los Angeles*, 441 F. Supp. 3d 915, 935 (C.D. Cal. 2019). The Constitution safeguards "privacy in one's association" from "varied forms of governmental action which might interfere with freedom of assembly" and other protected activities, regardless of the particular harms any such interference may inflict on the individual. *NAACP*, 375 U.S. at 462. Compelled disclosure is, therefore, a kind of strict liability offense that requires substantial justification irrespective of the injury that may befall its victim. *Cf. Buckley v. Valeo*, 424 U.S. 1, 64, 96 (1976) (noting the Supreme Court has "repeatedly found that compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment."). So too here, where the Defendants' retention of information about Plaintiffs without justification causes an injury-in-fact *on its own*. *See Wilson v. Webster*, 467 F.2d 1282, 1283–84 (9th Cir. 1972) (holding that arrest records' "continued existence may seriously and unjustifiably serve to impair fundamental rights of the persons to whom they relate"); *Shipp*, 568 F.2d at 133 ("the maintenance of his criminal records continues to operate to his detriment.").

54

There is no precedent for the position that the government can insulate its unlawful collection of private information from a constitutional challenge on the fortuity that a victim of that violation is unable to show some independent harm stemming from the records' continued storage. The outcome of such a rule created by the district court would be dramatic. It would nullify the very same long-standing expungement remedy in cases where a litigant was unable to predict how the government may utilize the fruits of its unconstitutional collection of private information—even when all parties agree that the government's actions were illegal, the information it recorded illegally obtained, and the records kept in perpetuity. *Cf. Spock v. United States,* 464 F. Supp. 510, 517 (S.D.N.Y. 1978) (finding challenge to unlawful surveillance not moot in part because "the Government is alleged to have kept on file all of the information with respect to plaintiff.").

In support of its flawed ruling, the district court set aside this Circuit's most recent pronouncement, in *Fazaga v. Fed. Bureau of Investigation*, on the relationship between the expungement remedy and standing to challenge the unconstitutional retention of records, claiming that *Fazaga* did not address Article III standing at all. This is incorrect. In *Fazaga*, a putative class of Muslim Americans challenged a secret FBI operation they alleged targeted them based on their religion and resulted in the unlawful searches of their homes and recording of

their protected activities. 965 F.3d at 1025–28. They alleged that the this surveillance program resulted in the creation of reems of records about the Muslim community in Orange County, California, including "hundreds of phone numbers; thousands of email addresses; background information on hundreds of individuals; hundreds of hours of video recordings of the interiors of mosques, homes, businesses, and associations; and thousands of hours of audio recordings of conversations, public discussion groups, classes, and lectures." *Id.* at 1027. They claimed this surveillance program violated, *inter alia*, the First, Fourth, and Fourteenth Amendments' prohibitions on religious discrimination and unlawful search and seizure.

In seeking to strike the plaintiffs' demand to expunge these records, the FBI argued both that the Constitution does not provide an inherent expungement remedy and that, "in any event, plaintiffs advance no plausible claim of an ongoing constitutional violation" even if such remedy existed. Superseding Br. for Gov't at 29, *Fazaga v. FBI*, No. 13-55017 (9th Cir. 2020), ECF No. 73. It argued that even if the collection of the records may have violated the Fourth Amendment, the plaintiffs could not seek an injunction to remove those records because the FBI's *use* of them does not violate the Constitution. *Id.* at 29–30. The plaintiffs countered that "the existence of the records itself gives rise to a chilling effect on Plaintiffs' exercise of their religion—a harm that Defendants can cure through expungement."

56

Reply Br. for Plaintiffs at 136, *Fazaga v. FBI*, No. 13-55017 (9th Cir. 2020), ECF No. 85-2. This Court adopted the plaintiffs' view, rejecting the FBI's argument that they did not claim "an ongoing constitutional violation" even if expungement was available as a remedy. *Fazaga*, 965 F.3d at 1054. This panel quoted with approval the Article III standing discussion in *Norman-Bloodsaw* for the proposition that "[a]t the very least, the retention of undisputedly intimate medical information obtained in an unconstitutional and discriminatory manner would constitute a continuing 'irreparable injury' for purposes of equitable relief." 135 F.3d at 1275. The *Fazaga* court's rejection of the FBI's "records plus more" theory of standing coupled with its approving quotation of its prior Article III holding in *Norman-Bloodsaw* belies the district court's statement below that *Fazaga* did not "reach Article III standing." 1-ER-16.

### B.  Plaintiffs satisfy the causation requirement of Article III.

Plaintiffs also met the causation requirement for Article III standing. The district court did not analyze this second factor in its decision below, likely because Plaintiffs' satisfaction of it self-evident. This prong of the standing analysis requires a "causal connection" between the defendant's conduct and *the particular plaintiff* seeking relief in federal court. As the Supreme Court explained,

> When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing

57

> depends considerably upon whether the plaintiff is himself
> an object of the action (or forgone action) at issue. If he is,
> there is ordinarily little question that the action or inaction
> has caused him injury, and that a judgment preventing or
> requiring the action will redress it.

*Lujan*, 504 U.S. at 561–62.

This case concerns Defendants' creation of surveillance records concerning Plaintiffs themselves, and the injuries arising out of those actions—not an "asserted injury aris[ing] from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*." *Lujan*, 504 U.S. at 562. Nor are there "numerous third parties whose independent decisions collectively have a significant effect on plaintiffs' injuries." *Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1142 (9th Cir. 2013) (internal quotations and citation omitted). All three Defendant agencies were responsible for Plaintiffs' injuries, as they worked together to establish a multi-agency working group designed in part to gather intelligence and monitor individuals like Plaintiffs, all without criminal suspicion or justification. Plaintiffs therefore met the causation requirement for seeking expungement.

## C. Expungement will remedy Plaintiffs' injuries.

Third, expungement of the offending documents will remedy Plaintiffs' constitutional claims, contrary to the district court's declaration otherwise. 1-ER-17 at 16 ("Plaintiffs have not shown that any of their injuries are redressable by

expungement."). The redressability requirement of the standing inquiry "analyzes the connection between the alleged injury and requested judicial relief," requiring "a substantial likelihood that the injury will be redressed by a favorable judicial decision." *Wash. Envtl. Council*, 732 F.3d at 1146. Here, both Plaintiffs' constitutional claims can be in part redressed by expunging the offending records at issue in this litigation. Just as in *Fazaga*, Plaintiffs here complain that the unlawful maintenance of surveillance records containing private and First Amendment-protected information about them is *itself* injurious to their right to free association and expression. *Doe v. U.S. Air Force*, 812 F.2d 738, 740 (D.C. Cir. 1987) (retention of copies of documents unlawfully seized "prevents the 'eradication' [of the effects of the violation] from being complete").

Plaintiffs therefore were not required to explain how the retention of records chills their First Amendment activity, or how the records will make them more likely to be investigated, or how expungement would lessen their fear of future injury. 1-ER-17. Just as in *Norman-Bloodsaw*, where "the retention of undisputedly intimate medical information obtained in an unconstitutional and discriminatory manner would constitute a continuing 'irreparable injury' for purposes of equitable relief," 135 F.3d at 1275, so too would Defendants' ongoing collection and storage of troves of surveillance records about Plaintiffs here

constitute injury by itself. And since destruction of said records eliminates this irreparable injury, Article III's redressability requirement is met.

It is here that the error in the district court's reasoning becomes most apparent. At the same that the district court below required Plaintiffs to introduce evidence of a likelihood of future beyond collection of the records themselves, it simultaneously appeared to concede that *some* records could be "so sensitive that their retention alone constitutes a continuing injury or produces a chilling effect on their First Amendment-protected activity." 1-ER-17 (citing *Norman-Bloodsaw*, 135 F.3d at 1275). But this concession appears nowhere in this Circuit's precedent on expungement, and introduces an entirely new standard for expungement unsupported by the First Amendment and unadministrable for a reviewing court.

For one, *Norman-Bloodsaw* makes no mention of such a standard, and the similarity of the facts there to the ones here reveal the district court's error. That case concerned medical examinations taken by a government research institution of newly-hired administrative employees prior to their assumption of duties. Although the recruits were told they would be subject to these examinations, they alleged that the medical exams included testing for private medical information, including pregnancy, sickle cell anemia, and sexually transmitted diseases that they were unaware of and did not consent to. They alleged after the institution conducted these tests, it retained the test results indefinitely. Importantly, the

*Norman-Bloodsaw* plaintiffs did not allege that the defendants "took any subsequent employment-related action on the basis of their test results, or that their test results have been disclosed to third parties." *Norman-Bloodsaw*, 135 F.3d at 1265. They filed suit alleging, among other claims, that the defendants violated the federal constitutional right to privacy "by conducting the testing at issue, collecting and maintaining the results of the testing, and failing to provide adequate safeguards against disclosure of the results." *Id.*

This Court reversed the district court's grant of summary judgment on the right to privacy claim, reasoning that the compelled disclosure of sensitive medical information was highly invasive, and questions of fact existed as to whether the testing was justified or performed consensually or with knowledge of their particulars. *Norman-Bloodsaw*, 135 F.3d at 1270. Relevant here, the defendants challenged the plaintiffs' right to injunctive relief, which included a demand "to destroy the results of such illegal testing upon employee request." *Id.* at 1275. The panel concluded that "the retention of undisputedly intimate medical information obtained in an unconstitutional and discriminator manner would constitute a continuing 'irreparably injury' for purposes of equitable relief," even without evidence showing a risk that defendants would utilize the medical information in an injurious way. *Id.*

61

The only difference between this case and *Norman-Bloodsaw* is content of the information collected, a difference that is constitutionally irrelevant to the Article III question. Nothing in *Norman-Bloodsaw* cabined its holding only to certain kinds of invasive medical information, and Plaintiffs can find no case ranking the relative sensitivity of medical information as against political speech or associational habits. *See Gibson v. Fla. Legislative Investigation Comm.*, 372 U.S. 539, 556–57 (1963) (noting the importance of protecting individuals' right to "espousing beliefs already unpopular with their neighbors" from the government's compelled disclosure of their protective associations, and the presumed "deterrent and 'chilling' effect on the free exercise of constitutionally enshrined rights of free speech, expression, and association" from such compulsion); *NAACP*, 357 U.S. at 462 (recognizing "the vital relationship between freedom to associate and privacy in one's associations"); *cf. Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021) (noting "it is immaterial" to the level of scrutiny "whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters.").

The rule enunciated by the district court would ask judges to divine the relative sensitivity of the various privacies of life protected by the Constitution, a near impossible task. The more administrable rule is that which this Court restated in *Norman-Bloodsaw* and *Fazaga*: that the ongoing maintenance of information

62

either protected by the Constitution or collected in violation of the Constitution constitutes irreparable injury sufficient to confer standing to seek its destruction.

***

For these reasons, the district court's expungement analysis misapplied controlling Ninth Circuit and extra-Circuit authority, and should be reversed.

**CONCLUSION**

For the foregoing reasons, Plaintiffs-Appellants respectfully request the Court reverse the district court's order awarding summary judgment and remand the case with instructions to re-open discovery to conduct the additional depositions and to adjudicate any outstanding discovery motions.

Date: May 27, 2022

ACLU FOUNDATION OF SOUTHERN CALIFORNIA

*/s/ Mohammad Tajsar*
Mohammad Tajsar

*Attorney for Appellants Nora Phillips, et al.*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 21-55768

I am the attorney or self-represented party.

**This brief contains** 12,716 **words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ X ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _s/Mohammad Tajsar_____ **Date** _____May 27, 2022_____